[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
APRIL 12, 2007
THOMAS K. KAHN
CLERK

_____

No. 05-17045

_____

D. C. Docket No. 05-00136-CR-CAP-1

UNITED STATES OF AMERICA,

Plaintiff-Appellant

versus

BINYAMIN OHAYON,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

**(April 12, 2007)**

Before BIRCH and PRYOR, Circuit Judges, and NANGLE,* District Judge.

---

* Honorable John F. Nangle, United States District Judge for the Eastern District of Missouri, sitting by designation.

PRYOR, Circuit Judge:

This appeal by the United States involves the application of collateral estoppel to a partial verdict, which is an issue that has divided not only our sister circuits but panels of our circuit as well. The question presented is whether an acquittal on a charge of an attempted drug offense requires, under the Double Jeopardy Clause of the Fifth Amendment, the dismissal of a charge of a drug conspiracy on which the jury was unable to reach a verdict. Binyamin Ohayon was tried on charges of conspiracy to possess with intent to distribute and attempt to possess with intent to distribute MDMA, or ecstasy. 21 U.S.C. §§ 841(a)(1), 846. Ohayon is an Israeli citizen who has difficulty communicating in English and was in the United States on a valid visa. Ohayon was arrested after he took a bag of drugs from a hotel room occupied by a confidential informant and placed the bag in the trunk of a car. At trial, Ohayon's only defense was that he was unaware of the contents of the bags. A jury acquitted Ohayon of the attempt count but was unable to reach a unanimous verdict on the conspiracy count. The United States sought to retry Ohayon for conspiracy, but the district court concluded that Ohayon's acquittal of attempt collaterally estopped the government from retrying him on the conspiracy charge. Because it is clear that the jury found reasonable doubt that Ohayon knew that he was acquiring drugs, and a conviction for

2

conspiracy would require the government to prove beyond a reasonable doubt that Ohayon knew that he was acquiring drugs, we hold that the government is collaterally estopped from retrying Ohayon for conspiracy to possess with intent to distribute those drugs. We affirm the dismissal of the conspiracy charge against Ohayon.

## I. BACKGROUND

In February 2005, Brian Gallacher and Dan Brown recruited Rainer Kunert to help them transport approximately 90 pounds of methamphetamine from Vancouver, British Columbia, to Atlanta, Georgia. After delivering the drugs in Atlanta, Kunert was to deliver payment for the drugs in Los Angeles, California. On February 21, Brown brought the drugs across the Canada-United States border into the State of Washington, where he loaded them into Kunert's van. The next day, Kunert rented a car in Spokane, Washington, and began traveling with the drugs to Atlanta. Kunert called Gallacher and Brown each night to update them on the progress of his trip.

On February 25, Kunert was stopped by a police officer in Foristel, Missouri. Kunert consented to a search of his car, and the officer discovered three duffle bags in the trunk containing approximately 100,000 ecstasy tablets. Kunert agreed to cooperate with law enforcement officials and was flown to Atlanta under

the supervision of the Drug Enforcement Administration to participate in a controlled delivery of the drugs. That night, Kunert called Gallacher and Brown and told them he had checked into a hotel in Nashville, Tennessee, and would arrive in Atlanta the following day. At approximately 9 p.m. on February 26, Kunert called Gallacher and Brown and told them he had arrived in Atlanta. Gallacher told Kunert that someone would arrive at his hotel to pick up the drugs either immediately or in "a couple of days."

About four days later, on March 2, Kunert received a call from Gallacher who told Kunert to contact a man named "Eddie," who was later determined to be Binyamin Ohayon. Gallacher told Kunert to identify himself to Eddie as "Rain Man" and to provide Eddie with his location so that Eddie could pick up the drugs. Ohayon arrived at the hotel accompanied by a second individual, who remained in the car the entire time.

When Ohayon entered the hotel room, Kunert showed him the duffle bags and asked for the money, but Ohayon did not open the bags or inquire about their contents. Ohayon told Kunert he did not have any money, and Kunert called Gallacher to see if he should still give Ohayon the duffle bags. Gallacher told Kunert to give Ohayon the bags, and Ohayon carried the first of the bags to his car and placed it in his trunk. When he returned to the hotel room for the other two

4

bags, he was arrested. Neither Ohayon nor his companion resisted or attempted to flee, and both appeared surprised by what was taking place.

At trial, the government argued that Ohayon "committed two crimes, essentially overlapping crimes. One, he conspired to possess with intent to distribute MDMA, also known as ecstasy; and second, . . . he did attempt to possess with intent to distribute that same MDMA, ecstasy."

The sole disputed issue of fact at trial was whether Ohayon knew the duffle bags he was receiving from Kunert contained drugs. The government produced evidence that Ohayon flew from Amsterdam, a city known to be a source of ecstasy, to Vancouver, in August 2004. The government also produced evidence that Ohayon spent time in Los Angeles before traveling to Miami, Florida, where, on February 28, 2005, he rented the car that he drove to Kunert's hotel in Atlanta. On his way to Atlanta, on March 1, he stopped to purchase a prepaid cell phone, which does not require a long-term contract or the conveyance of any personal information by the user, on which he placed calls to both Vancouver and Los Angeles before his arrest the following day. Edward Hammett, an agent with the DEA, testified that these types of phones are often used by drug dealers. Agent Hammett also testified that a piece of paper found in Ohayon's pocket, which contained a series of numbers on it, appeared to be a drug ledger, and he believed

5

Ohayon's passenger was conducting counter-surveillance, as often happens during drug transactions. The government argued in its closing that this evidence proved Ohayon "knew exactly what was going on" and was "aware there are people up in Canada from whom he is getting that ecstasy."

Ohayon's defense was that he was unaware the bags he was picking up from Kunert contained drugs. He framed this defense in his opening statement: "The issue for you in this case is to decide whether Mr. Ohayon, when he arrived that day, was a knowing participant in a drug transaction." He said that he had traveled to Canada to look for work and to visit relatives. He also stated that he had plans to meet his ex-wife and children in southern Florida for an extended stay and produced evidence that he had been working with the Israeli consulate in Miami to obtain permission for his family to enter the United States. He maintained that shortly after arriving in Florida, he received a call from someone he had met in Canada who offered to pay him to transport some personal effects from Atlanta to Los Angeles.

Ohayon presented no witnesses of his own but elicited testimony from government witnesses that supported his defense. Kunert testified that, after his arrest, Gallacher and Brown expressed concern that he was cooperating with law enforcement officers, and several things led Kunert to believe they were changing

6

their plans at the last minute. Although Kunert expected to meet his contact within a day or two of arriving in Atlanta, it was not until four days after arriving that Gallacher gave him the telephone number for "Eddie." Kunert also stated that the contact was supposed to know his location and would be expecting him to drive a recreational vehicle, but Kunert had to provide Ohayon with his location and Ohayon never mentioned a recreational vehicle nor asked why Kunert was not driving one. Kunert testified that he expected the contact to pay for the drugs when he picked them up, but Ohayon had no money and never asked what was in the bags, inspected the bags, or acted as though he knew they contained drugs.

Ohayon elicited favorable testimony from two other witnesses. Ohayon elicited testimony from Brian Sullivan, an agent with the DEA, that, although drug dealers often use false names to rent cars and make purchases, Ohayon had consistently used his real name. Agent Hammett admitted on cross-examination that his conclusion that the piece of paper found in Ohayon's pocket was a drug ledger was pure speculation based on the fact that he had heard Kunert was to be paid $10,000 and two of the numbers on the paper totaled 10,000. He also admitted that the behavior of Ohayon's passenger was consistent with that of an innocent person and it was unusual that the passenger did not help load the 90 pounds of drugs into the car. Hammett considered the passenger to be doing

7

counter-surveillance only because he accompanied another individual to a drug pick-up. Ohayon argued in closing that the evidence showed he had no knowledge he was picking up drugs for his Canadian acquaintance.

When both sides had rested, the district court charged the jury that, to find Ohayon guilty of conspiracy, the jury had to find beyond a reasonable doubt that two or more persons agreed to possess with intent to distribute a controlled substance and Ohayon knew the general nature of this plan and willfully joined it. To find Ohayon guilty of attempt, the jury had to find beyond a reasonable doubt that he knowingly and willfully intended to possess with intent to distribute a controlled substance and took a substantial step toward commission of that crime. The court specifically defined the terms "knowingly" and "willfully" and emphasized that Ohayon did not need to know the precise nature of the controlled substance to be found guilty.

The jury asked the court three questions during its deliberations. First, the jury asked to review the video recording of Ohayon's exchange with Kunert in Kunert's hotel room. The jury then asked two questions about terms used in the two offenses. The jury first asked, "In drug-related offenses, what is the legal definition of distribution?" The court instructed the jury that "[t]o possess with intent to distribute simply means to possess with intent to deliver or transfer

8

possession of a controlled substance to another person with or without any financial interest in the transaction." Later, the jury asked, "On both counts, does the defendant have to know that the controlled substances were in the bags in order to be in violation of Title 21?... In other words, does ignorance of the contents of the bags matter in this situation?"

The court gave two responses to the last question about potential ignorance of the contents of the bags. First, it repeated its earlier instructions as to the meanings of the terms "knowingly" and "willfully" and then stated that, although Ohayon did not need to know the specific nature of the controlled substance in the bags, "[t]he government must prove beyond a reasonable doubt, however, that the defendant did know that some type of prohibited substance was in the bags." Second, it gave the jury a deliberate ignorance charge:

> [I]f you find . . . that the defendant believed that he possessed a controlled substance, and deliberately and consciously tried to avoid learning that he was picking up a controlled substance . . . you may treat such deliberate avoidance of positive knowledge as the equivalent of knowledge . . . . [H]owever, the requisite proof of knowledge on the part of the defendant cannot be established merely by demonstrating that he was negligent, careless or foolish.

The jury asked for a written copy of this charge after it returned to its deliberations.

After another period of deliberation, the jury, by means of a general verdict, acquitted Ohayon of the attempt count but announced it could not reach a verdict

9

on the conspiracy count. The district court asked the jury to continue deliberating, and Ohayon filed motions for acquittal and to bar retrial on the ground of collateral estoppel. The jury later returned and announced it was still unable to reach a verdict as to the conspiracy count. The court declared a mistrial and scheduled a new trial as to the conspiracy count.

Ohayon then supplemented with briefs his motions for acquittal and to bar retrial. The court determined, based on the jury instructions and the fact that Ohayon relied on one defense, that the government failed to prove that Ohayon was aware that there were drugs in the bags. Because it would be "logically inconsistent" to conclude both that Ohayon did not know the bags contained drugs and that he was aware of and participated in the conspiracy to possess those drugs, the court held that the government was collaterally estopped from retrying Ohayon and dismissed the indictment. The court denied as moot Ohayon's separate motion for acquittal.

## II. STANDARD OF REVIEW

We review de novo the dismissal of an indictment based on collateral estoppel. United States v. Quintero, 165 F.3d 831, 834 (11th Cir. 1999). The party asserting estoppel bears the burden of persuasion that the jury found the facts on

which the defense of estoppel rests and that those facts bar another trial about them. Id. at 835.

## III. DISCUSSION

Our analysis of collateral estoppel based on double jeopardy has two steps. "First, courts must examine the verdict and the record to see 'what facts,' if any, were necessarily determined in the acquittal at the first trial." United States v. Shenberg, 89 F.3d 1461, 1479 (11th Cir. 1996) (quoting United States v. Brown, 983 F.2d 201, 202 (11th Cir. 1993)). "Second, the court must determine whether the previously determined facts constituted 'an essential element'" of the second offense. Id. (quoting Brown, 983 F.2d at 202).

The United States contends that the district court erred at each stage of this analysis. First, the government maintains that the basis of Ohayon's acquittal of attempt is unclear. Second, the government argues that, even if the basis of Ohayon's acquittal of attempt is clear, Ohayon can be retried for conspiracy because the facts that had to be established to convict Ohayon of attempt would be subject to a lower standard of proof—preponderance of the evidence—in a second trial of the charge of conspiracy. We address each argument in turn.

11

*A. Ohayon Satisfies the First Stage of Collateral Estoppel Because the Jury Clearly Found He Was Unaware of the Contents of the Bags.*

Our review of the argument of the government that the basis of Ohayon's acquittal is unclear is divided in three parts. We first review the trial record to discern, if possible, the basis of the jury's verdict. We next consider the argument of the government that the jury's verdict might have been based on a misunderstanding of the term "possess." We then consider the argument of the government that the partial verdict necessarily allows a retrial of the conspiracy charge.

1. A Rational Jury That Considered the Pleadings, Evidence, Charge, and Other Relevant Matter Could Not Have Acquitted Ohayon on a Ground Other Than His Ignorance of the Contents of the Bags.

The Supreme Court defined in Ashe v. Swenson the standard that governs the defense of collateral estoppel based on a general verdict: "Where a previous judgment of acquittal was based upon a general verdict, as is usually the case," a court must ask "whether a rational jury could have grounded its verdict upon an issue other than that which the defendant seeks to foreclose from consideration." 397 U.S. 436, 444, 90 S. Ct. 1189, 1194 (1970) (internal quotation mark omitted). When making this determination, a court must "examine the record of a prior proceeding, taking into account the pleadings, evidence, charge, and other relevant matter." Id. (internal quotation mark omitted). This inquiry "'must be set in a

12

practical frame,'" id. (quoting Sealfon v. United States, 332 U.S. 575, 579, 68 S. Ct. 237, 240 (1948)), and a court is not to conduct its analysis "with the hypertechnical and archaic approach of a 19th century pleading book, but with realism and rationality," id.; see also United States v. Mulherin, 710 F.2d 731, 740 (11th Cir. 1983) (collateral estoppel applies when "the jury could not have rationally based its verdict on any other issue than the one the appellants seek to foreclose").

After careful and thorough review of the record, we conclude that a rational jury could not have acquitted Ohayon on a ground other than his ignorance of the contents of the bags. The lone dispute at trial was whether Ohayon was aware of the contents of the bags. That dispute was resolved by the jury in favor of Ohayon.

At trial, Ohayon never disputed that he placed one of the duffle bags in his car and returned to the hotel room to obtain the other two; his sole defense was that he believed the bags contained the personal effects of a man he met in Canada. Ohayon asserted in his opening statement and closing argument that he was in Canada and the United States for legitimate purposes. Ohayon elicited testimony that Gallacher and Brown had changed their plans at the last minute; Ohayon was ignorant of several of the details of the plan Kunert expected him to know; Ohayon did not attempt to conceal his identity when purchasing the cell phone; and the

13

activities of Ohayon and his companion leading up to their arrest were entirely consistent with the actions of innocent men.

In its case against Ohayon, the government likewise focused on the issue of Ohayon's knowledge. The government emphasized in its closing argument that Ohayon "knew exactly what was going on" and was "aware there are people up there in Canada from whom he is getting that ecstasy." The government did not present its case to the jury as turning on any issue other than Ohayon's knowledge.

Like the parties, the jury focused on Ohayon's knowledge. The jury was given definitions of "knowingly" and "willfully," and the jury asked a question about Ohayon's mental state. The jury wanted to know whether, for both counts, Ohayon had to be aware of the nature of the drugs in the bags and whether ignorance would excuse him from culpability. The jury requested a written copy of the deliberate ignorance charge.

In the words of Ashe, "[t]he single rationally conceivable issue in dispute before the jury was whether" Ohayon knew the bags contained drugs. 397 U.S. at 445, 90 S. Ct. at 1195. The record yields no other conclusion than that a rational jury that acquitted Ohayon of attempt did so because it found reasonable doubt that Ohayon was aware of the contents of the bags. There was no other factual issue.

14

## 2. A Rational Jury Could Not Have Based Ohayon's Acquittal on a Misunderstanding of the Term "Possess."

The government argues that confusion about the term "possess" may account for the partial verdict because that term was never defined for the jury. The government argues that the jury may have thought Ohayon did not view himself as attempting to possess the bags because he viewed his role as that of a courier. This possibility, the government contends, means we would be speculating if we tried to determine the basis of the jury's verdict, which we are forbidden from doing. See United States v. Gil, 142 F.3d 1398, 1401 (11th Cir. 1998). The government contends that the possibility that the jury was confused by the term "possess" makes it impossible to conclude that the jury necessarily acquitted Ohayon of attempt because it found he was unaware of the contents of the bags.

The problem with this argument is that it presumes that the relevant standard is a subjective one—whether Ohayon's jury grounded its verdict on an irrational understanding of the term "possess." Ashe requires that we apply an objective standard and ask "whether a rational jury" exposed to the same "pleadings, evidence, charge, and other relevant matter" "could have grounded its verdict upon an issue other than" the one Ohayon seeks to foreclose from consideration. 397 U.S. at 444, 90 S. Ct. at 1194 (emphasis added); see United States v. Hogue, 812

15

F.2d 1568, 1581 (11th Cir. 1987) (defendant's argument misplaced because it was "directed not to the necessity for a rational jury to reach its not guilty verdict by a certain route, but rather to the probability that a specific jury actually reached its not guilty verdict by a certain route").  Because we ask what a rational jury would have done, the possibility that the jury's verdict rested upon error plays no part in our analysis.

A rational jury could not have grounded its verdict on a misunderstanding of the term "possess," or on any other mistake.  Because collateral estoppel is grounded in the Double Jeopardy Clause of the Fifth Amendment, Ashe, 397 U.S. at 445, 90 S. Ct. at 1195, the government is barred from correcting inconsistent verdicts by a single jury, even those based on "mistake, compromise, or lenity," United States v. Powell, 469 U.S. 57, 65, 105 S. Ct. 471, 476 (1984).  The possibility of jury nullification also plays no part in collateral estoppel analysis. Brown, 983 F.2d at 203 ("While the possibility of jury nullification may influence the strategy of trial lawyers, it cannot enter into the analysis of courts making collateral estoppel inquiries.").  As we would disregard a jury's intentional reliance upon faulty meanings of the terms of an offense, so too must we disregard that reliance when it is unintentional.

Because there is no other ground upon which a rational jury could have based its verdict, we are not speculating, in contrast with the dilemma in Gil, as to the basis of the jury's verdict. In Gil, we would have been speculating had we tried to determine the basis of Gil's acquittal because there was a ground other than the one Gil wished to foreclose from consideration upon which a rational jury could have based its verdict. A jury acquitted Gil of possession with intent to distribute cocaine but was unable to reach a verdict on a charge of conspiracy to possess with intent to distribute cocaine. 142 F.3d at 1399. Trace amounts of Clue Spray, a substance that is visible only under ultraviolet light and was used by law enforcement to coat a block of cocaine used in a controlled delivery, were found on Gil's person and clothing. Id. at 1400. When the government sought to retry her, Gil filed a motion to bar reintroduction of the Clue Spray evidence on the ground that the jury must have found that she never touched the cocaine. Id. We rejected this argument, because the evidence about Clue Spray could have led to a verdict based on other grounds—for example, that Gil touched but never possessed the cocaine. Id. at 1401-02.

### 3. The Partial Verdict Does Not Bar the Application of Collateral Estoppel.

The government also argues that the partial verdict itself is evidence that the jury did not acquit Ohayon based on his ignorance of the contents of the bags. The

17

government argues that, if the jury had acquitted Ohayon of attempt because it found him to be unaware of the contents of the bags, it necessarily would have acquitted him of conspiracy as well. The government reasons that the failure of the jury to acquit Ohayon of the conspiracy charge establishes that the jury rested its acquittal of Ohayon on the attempt charge on some other ground.

The government relies on United States v. Quintero, where we affirmed a finding that collateral estoppel did not bar another prosecution of the defendant. 165 F.3d at 833. Quintero argued that the jury acquitted him of conspiracy to launder money because it found he lacked the requisite criminal intent, but we stated that, if the jury had acquitted Quintero on that ground, it should also have acquitted him of the substantive money laundering count on which it failed to reach a verdict. We reasoned that the jury must have acquitted Quintero on some other ground. Id. at 836-37. We reached a similar conclusion in United States v. Bennett, when we rejected a defense of collateral estoppel on the ground that, if the jury had acquitted Bennett of cocaine importation charges because it doubted the overall credibility of government witnesses, as Bennett contended, it also would have acquitted him of cocaine distribution charges instead of failing to reach a verdict on those counts. 836 F.2d 1314, 1316-17 (11th Cir. 1988).

This argument requires that we not consider the actual basis of the acquittal.

18

Instead, this argument requires that we assume that the acquittal on one charge and the failure to reach a verdict on another charge are necessarily reconcilable. Under the logic of the argument of the government, a partial verdict could never lead to the application of collateral estoppel even though the acquitted charge has a common element with a charge about which the jury was unable to reach a verdict.

This argument fails. Our prior precedent, which predates both Bennett and Quintero, but was cited by neither panel, establishes that a partial verdict can bar another prosecution of a mistried charge based on collateral estoppel. In United States v. Larkin, the defendant was charged with conspiring to embezzle funds and falsify records, and with several substantive counts of the same, based on the vicarious liability theory of Pinkerton v. United States, 328 U.S. 640, 66 S. Ct. 1180 (1946). Larkin, 605 F.2d 1360, 1371 (5th Cir. 1979), modified on other grounds, 611 F.2d 585 (5th Cir. 1980). The jury acquitted Larkin of the vicarious liability counts but was unable to reach a verdict on the conspiracy count. Id., 605 at 1363. Applying Ashe, we held that the government was estopped from retrying Larkin for conspiracy because, regardless of which of two potential issues served as the basis of the jury's verdict, the government would be required to prove a fact established against it by the acquittals to convict Larkin of conspiracy. Id. at 1371. When a decision of this Court conflicts with an earlier decision that has not been

19

overturned en banc, we are bound by the earlier decision.  See Robinson v. Tanner, 798 F.2d 1378, 1383 (11th Cir. 1986) ("[W]hen a later case cannot be reconciled with or distinguished from [an earlier precedent], we deem ourselves bound to follow [the earlier precedent].").

Although Larkin settles the issue, if we were writing on a clean slate, we would recognize that the argument of the government does not follow the standard established in Ashe.  Ashe requires that we look at all potential bases of a verdict of a rational jury and ask what the record tells us about the basis for an acquittal, but the government asserts that we should search for the basis of a mistried count. The problem with the argument of the government is that the search for the basis of a mistried count will necessarily be in vain.

The argument presumes that a mistried count, like an acquitted count, is a decision for which we can discern, or to which we can impute, a single basis.  In truth, the failure of a jury to reach a verdict is not a decision; it is a failure to reach a decision.  A partial verdict does not comprise two decisions that we must try to reconcile, because the mistried count is not a decision for which we can discern, or to which we can impute, a single, rational basis.  The very essence of a mistried count is that the jury failed to reach agreement.

Consistent with this reasoning, two of the three of our sister circuits to have

20

decided the issue have also concluded, as we did in <u>Larkin</u>, that a partial verdict

can bar prosecution of mistried charges based on collateral estoppel. In <u>United</u>

<u>States v. Romeo</u>, a jury acquitted on a charge of possession with intent to distribute

marijuana but failed to reach a verdict on a charge of importation of marijuana.

114 F.3d 141, 142 (9th Cir. 1997). The only contested element at trial was whether

Romeo knew there was marijuana in the car he drove from Mexico into the United

States. <u>Id.</u> Applying "<u>Ashe</u>'s 'realism and rationality' approach," the Ninth

Circuit found that a rational jury could only have acquitted Romeo of the

possession charge on the ground that he was unaware there was marijuana in the

car. <u>Id.</u> at 143 (quoting <u>Ashe</u>, 397 U.S. at 444, 90 S. Ct. at 1194). The court

concluded that, because Romeo's knowledge of the presence of marijuana in the

car was "also an essential element of the [charge] remaining for retrial," the

government was estopped from retrying Romeo on the importation charge. <u>Id.</u> at

143-44.

The Sixth Circuit has likewise held that a partial verdict can bar another

prosecution of a mistried charge based on collateral estoppel. In <u>United States v.</u>

<u>Frazier</u>, a jury acquitted the defendants of a charge of misapplication of funds but

failed to reach a verdict on a charge of making false entries. 880 F.2d 878, 885

(6th Cir. 1989). The court concluded that the government was estopped from

21

retrying the defendants for making false entries, because "[a] jury could not conclude that the defendants willfully caused false entries to be made . . . without also finding that the defendants willfully and knowingly misapplied bank funds" as charged in the acquitted count. Id. at 886.

One of our sister circuits has held to the contrary. In United States v. White, the District of Columbia Circuit refused to apply collateral estoppel to another prosecution of a mistried charge based on the same reasoning we employed in Quintero and Bennett. The court in White concluded that, if the jury had acquitted White on the ground he asserted, it would not have failed to reach a verdict on the count the government sought to retry. 936 F.2d 1326, 1329 (D.C. Cir. 1991) (citing United States v. Scott, 464 F.2d 832, 833 (D.C. Cir. 1972)). See also Romeo, 114 F.3d at 145 (O'Scannlain, J., dissenting) ("[I]f the jury necessarily decided that Romeo did not know that drugs were in his trunk, the jury necessarily would have acquitted him of knowingly importing drugs into the United States."). That reasoning, as we have already explained, is flawed.

Although Quintero and Bennett both rely upon a line of reasoning that is inconsistent with our prior precedent in Larkin, the result in each of those decisions was nevertheless correct. In both Quintero and Bennett, we held alternatively that there was a ground on which a rational jury could have based its acquittal that did

22

not require a dismissal of the mistried offenses. In Quintero, we examined the jury instructions and concluded that the jury could have based Quintero's acquittal of conspiracy to launder money not on a lack of criminal intent, but on the ground that the government failed to prove that Quintero "knowingly entered into an agreement" to launder the money; that is, the jury could have found that Quintero intended to violate the law, but not in agreement with others. 165 F.3d at 837. In Bennett, we explained that the partial verdict could be explained by the jury's decision to credit the testimony of government witnesses as to the importation charges but not the distribution charges. 836 F.2d at 1316-17. By resting their alternative holdings on the discovery of another rational ground on which their juries could have reached their acquittals, Quintero and Bennett still satisfied the requirements of Ashe.

*B. Ohayon Satisfies the Second Stage of Collateral Estoppel Because His Knowledge of the Contents of the Bags Is an Essential Element of Both Offenses.*

The government contends that the second stage of collateral estoppel has not been satisfied on the ground that Ohayon's knowledge of the contents of the bags is not an essential element of conviction for conspiracy. The government argues that it should be allowed to retry Ohayon for conspiracy and argue that he knew the contents of the bags because, when the jury acquitted Ohayon of attempt, it found

23

only that the government had failed to prove beyond a reasonable doubt that Ohayon knew the contents of the bags; it did not find that the government failed to prove that fact by a lower standard, such as a preponderance of the evidence. The government maintains that to convict Ohayon of conspiracy, a jury would need to find beyond a reasonable doubt only that Ohayon entered into an agreement to possess with intent to distribute drugs. Ohayon's knowledge of the contents of the bags, like other potential pieces of evidence, could be considered by the jury so long as they were established by a preponderance of the evidence. The government relies upon Dowling v. United States, where the Supreme Court stated that "an acquittal in a criminal case does not preclude the Government from relitigating an issue when it is presented in a subsequent action governed by a lower standard of proof." 493 U.S. 342, 349, 110 S. Ct. 668, 672 (1990).

This argument fails. To establish that a defendant knowingly joined a conspiracy to possess with intent to distribute drugs, the government must prove beyond a reasonable doubt that the defendant knew the essential nature of the conspiracy. United States v. Garcia, 405 F.3d 1260, 1269-70 (11th Cir. 2005); United States v. Harris, 20 F.3d 445, 452 (11th Cir. 1994). A defendant who is unaware that he is in the process of possessing the drugs that are the object of the conspiracy is not, by any stretch of the imagination, aware of the essential nature of

24

the conspiracy. When the jury found reasonable doubt that Ohayon was aware of the contents of the bags, it resolved in his favor a fact that is an essential element of the charge of conspiracy to possess with intent to distribute.

The government maintains that, if we grant collateral estoppel, it will be the first time this Court has barred retrial of a defendant for conspiracy based on an acquittal of the substantive offense. Throughout its brief and numerous times at oral argument, the government characterized this appeal as involving an acquittal of a substantive crime and a prosecution for conspiracy to commit that substantive crime. The government even stated at argument that Ohayon had been acquitted of a "standard possession with intent charge." This description is an attempt by the government to avail itself of certain of our precedents. See Gil, 142 F.3d at 1402 (allowing reintroduction of Clue Spray evidence at trial for conspiracy after acquittal of substantive drug possession); Shenberg, 89 F.3d at 1480 n.23 (to the extent a case in our Circuit that pre-dated Dowling held that collateral estoppel "bars the government from introducing the underlying evidence of acquitted substantive counts in the retrial of the mistried conspiracy count," it is no longer good law).

The government is wrong for two reasons. First, Ohayon was acquitted of attempt, and attempt crimes are inchoate crimes, not substantive ones. See

25

Delgado, 56 F.3d 1357, 1365 (11th Cir. 1995).  Second, even if Ohayon had been charged with substantive possession (a genuine possibility, as the government noted in its closing argument) and acquitted under the same facts, arguments, evidence, and jury instructions as in the present case, we would again conclude that the jury found reasonable doubt about Ohayon's knowledge of the contents of the bags, in which case his acquittal would still bar his retrial for conspiracy.

The statement in Shenberg that acquittal of a substantive crime does not bar the reintroduction of otherwise admissible evidence in a retrial for conspiracy relied upon Dowling, see Shenberg, 89 F.3d at 1480 & n.23, which, as we have noted, allows the relitigation of issues when they are governed by a lower burden of proof upon retrial.  Dowling and Shenberg stand for the proposition that collateral estoppel is limited to situations where facts necessary to the acquittal on the substantive count must be proven beyond a reasonable doubt to convict of conspiracy.  These precedents do not suggest that an acquittal of a substantive count always allows another trial for conspiracy.

Although Ohayon's knowledge of the contents of the bags must be proved beyond a reasonable doubt in a prosecution of the conspiracy charge, there is some language in one of our precedents that supports the argument of the government that the district court erred.  In United States v. Brown, we stated that the analysis

26

of collateral estoppel involves two stages: first, "a court must determine whether the jury's verdict of acquittal was based upon reasonable doubt about a single element of the crime which the court can identify," 983 F.2d at 202; second, "the court must . . . decide whether that element is also an essential element of the crime" for which prosecution is now sought, id.

One way to read Brown is that our analysis requires that there be an "identity of overlapping elements," both as to "the legal definition of the elements" and "a factual identity of issues to such an extent that" it would be irrational to find reasonable doubt as to one crime but not the other. Id. at 204. We concluded that the jury acquitted Brown of bank fraud and conspiracy charges at his first trial because it found he had not acted willfully, and then noted that "[t]he underlying fraud crime for which Brown was convicted in the second trial had the same legal elements, including willfulness, as the fraud crime for which he was acquitted at the first trial." Id. We still denied collateral estoppel because there was not a sufficient factual identity of issues. Unlike the scheme in the first case, the scheme in the second did not involve straw purchasers, did not involve second mortgages and misrepresentations about those mortgages, and was not specifically vouched for by Brown's attorney. Id. at 205.

If we were to read Brown as requiring an identity of legal elements, the

27

government would not be estopped from retrying Ohayon for conspiracy. The legal elements of attempt to possess with intent to distribute drugs are "(1) acting with the kind of culpability otherwise required for the commission of the crime and (2) engaging in conduct which constitutes a substantial step toward the commission of the crime." United States v. Collins, 779 F.2d 1520, 1530 (11th Cir. 1986). The elements of conspiracy to possess with intent to distribute drugs are (1) an agreement between two or more persons to commit a crime, and (2) the defendant's knowing and voluntary participation in the conspiracy. Delgado, 56 F.3d at 1367. Because these crimes do not share a common legal element, under the Brown test, we would never reach the question whether there is any kind of factual identity, and the government would be allowed to retry Ohayon for conspiracy.

There are at least three problems with the reading of Brown that the two offenses must share a common legal element. First, because this requirement was unnecessary to the holding in Brown, it was dicta. Brown mentioned that the offenses shared the same legal elements, 983 F.2d at 204, but our decision did not depend on that determination. Estoppel was denied in Brown because there was an insufficient identity of factual issues. Id. at 205.

Second, Brown cited no precedent for the alleged requirement that the

offenses share a legal element, and this requirement is inconsistent with <u>Ashe</u> and the earlier precedents of this Court. <u>Ashe</u> formulated the doctrine of collateral estoppel by stating "that when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit." 397 U.S. at 443, 90 S. Ct. at 1194. Our earliest cases after <u>Ashe</u> similarly described the analysis of estoppel as a one-stage process concerned entirely with issues of fact. <u>See, e.g.</u>, <u>Wingate v. Wainwright</u>, 464 F.2d 209, 212 (5th Cir. 1972).

In <u>United States v. Lee</u>, we explained that another prosecution is barred when a fact necessarily determined at the first trial "is an essential element" of the remaining offense. 622 F.2d 787, 790 (5th Cir. 1980). This description from <u>Lee</u> became our standard formulation of the doctrine of collateral estoppel. <u>See, e.g.</u>, <u>Bennett</u>, 836 F.2d at 1316 (11th Cir. 1988); <u>United States v. DeMarco</u>, 791 F.2d 833, 836 (11th Cir. 1986); <u>United States v. Griggs</u>, 735 F.2d 1318, 1326 (11th Cir. 1984). Although <u>Lee</u> introduced the term "element" into collateral estoppel analysis, it did not change the fact-based nature of the inquiry. It is clear from the word "essential" that <u>Lee</u> did not use the term "element" to mean a legal element, because every legal element of a crime is essential for conviction of that crime. An "essential element," as described in <u>Lee</u>, is a factual component of an offense. In

29

both Ashe and the precedents of this Court beginning with Lee until Brown, the question was whether a fact, not a legal element, was shared by the offenses in question.

Third, after Brown we have not read that decision to require that the offense to be prosecuted and the offense of which the defendant was acquitted share a common legal element. The majority of our cases either ignore the Brown formulation altogether and rely entirely upon Lee and the precedents that followed Lee for the substance of collateral estoppel analysis, see Shenberg, 89 F.3d at 1479; United States v. Kramer, 73 F.3d 1067, 1073 (11th Cir. 1996); Gil, 142 F.3d at 1401, or they cite Brown without attempting to apply its test, see Quintero, 165 F.3d at 837 (denying collateral estoppel because fact presumed to have been found by the jury at the first trial was "not an 'ultimate fact' or element of" the second offense (citing Shenberg, 89 F.3d at 1479-81)). Two later precedents apply Brown, but neither requires that the offenses share a common legal element. See United States v. Magluta, 418 F.3d 1166, 1172, 1174 (11th Cir. 2005) (purporting to resolve the case on the second step of the Brown formulation but nowhere stating on which legal element Magluta's acquittal of drug charges was based or whether that legal element was also an element of money laundering); United States v. Garcia, 78 F.3d 1517, 1521-22 (11th Cir. 1996) (purporting to resolve the

30

case on the second step of the <u>Brown</u> formulation but nowhere stating what legal element was shared by a conspiracy to import drugs and a violation of the Travel Act). By not reading <u>Brown</u> to require that the offenses share a common legal element, these precedents in fact apply the standard from <u>Lee</u>. See <u>Magluta</u>, 418 F.3d at 1174 (collateral estoppel not appropriate because participation in drug activity not essential to a conviction for laundering drug proceeds); <u>Garcia</u>, 78 F.3d at 1522 (collateral estoppel not appropriate because finding that Garcia had not knowingly joined conspiracy established Garcia had not "'traveled in interstate [or foreign] commerce with the intent to promote unlawful activity'" as required for violation of the Travel Act (quoting <u>Kramer</u>, 73 F.3d at 1071) (alteration in original)).

To require that collateral estoppel applies only when the offenses share a common legal element would, as here, result in the denial of estoppel in some cases when it should clearly be granted. The jury acquitted Ohayon of attempt because it found reasonable doubt that he knew the contents of the bags, but in another trial the government would have to prove beyond a reasonable doubt that Ohayon was aware of the contents of the bags to convict him of conspiracy. It would be contrary to <u>Ashe</u>, <u>Wingate</u>, <u>Lee</u>, and other controlling precedents to allow Ohayon to be retried on the ground that this issue of fact common to both offenses

31

is not a legal element common to both offenses.  Contrary to the ambiguous dicta in <u>Brown</u>, the second stage of estoppel analysis requires only that we determine whether the facts found at the first trial are an essential element of conviction of the second offense.

## IV. CONCLUSION

The dismissal of the indictment against Ohayon is

**AFFIRMED.**