[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
DEC 07, 2010
JOHN LEY
CLERK

_____

No. 09-10978

_____

D. C. Docket No. 07-00540-CV-3-MCR-WCS

LAWRENCE DIGSBY,

Petitioner-Appellant,

versus

WALTER MCNEIL,

Respondent-Appellee.

_____

Appeal from the United States District Court
for the Northern District of Florida

_____

(December 7, 2010)

Before HULL and MARCUS, Circuit Judges, and COOKE,* District Judge.

HULL, Circuit Judge:

---

*Honorable Marcia G. Cooke, United States District Judge for the Southern District of Florida, sitting by designation.

Lawrence Digsby, a Florida prisoner serving a ten-year sentence for a felon-in-possession-of-a-firearm conviction, appeals from the district court's denial of his petition for a writ of habeas corpus under 28 U.S.C. § 2254. Digsby argues that his jury trial on his firearm charge was barred by collateral estoppel, and therefore his state appellate counsel was ineffective for not raising Digsby's collateral estoppel claim in the state direct appeal. After review and oral argument, we conclude that Digsby has not shown that the state courts' rejection of his ineffective appellate counsel claim was contrary to, or an unreasonable application of, clearly established federal law. Thus, we affirm the district court's denial of Digsby's § 2254 petition.

## I. FACTUAL BACKGROUND

### A. State Information

On October 19, 2004, Digsby was arrested and charged by information with aggravated battery with great bodily harm and discharge of a firearm, in violation of Fla. Stat. §§ 784.045(1)(a), 775.087(1) and (2) (Count 1); possession of a firearm by a convicted felon, in violation of Fla. Stat. §§ 790.23 and 775.087(2) (Count 2)[1]; and possession of less than 20 grams of marijuana, in violation of Fla. Stat. § 893.13(6)(a)–(b) (Count 3). On Digsby's motion, the firearm possession

---

[1]The information stated that Digsby "did unlawfully and knowingly . . . have in his or her care, custody, possession or control a firearm, to-wit: **a handgun**, . . . ."

2

charge was severed for a separate trial.

## B. Evidence at Trial on Counts 1 and 3

At Digsby's jury trial on the aggravated battery and drug charges, there was disputed testimony about the events surrounding the fight and shooting that led to his arrest. Eyewitness Jackie Swindell testified that, on September 29, 2004, he and his houseguest were at a pay phone on the corner of Mobile Highway and Green Street in Pensacola, Florida. Swindell said that, as they were standing at the phone, an older Jeep pulled into the gas station where the pay phone was located, and parked about ten feet from the phone booth. A man (later revealed to be victim George Willey[2]) who appeared to be drunk got out of the Jeep and asked if Swindell and his companion wanted to party; they declined. Swindell did, however, grant the man's request that Swindell light his cigarette.

After a couple of minutes, a beige station wagon pulled up with two men in it. The two men got out, and the passenger, Appellant Lawrence Digsby, confronted Willey about stealing the Jeep, and then punched him. This started a fight, during which Digsby was "whipping" Willey. Swindell testified that he "could see the silver or the top of the gun" in Digsby's back pocket during Digsby's fight with Willey. Swindell said that Digbsy kept knocking Willey

_____

[2]The trial transcript refers to the victim was "Wiley," but other sources, including the information, refer to him as "Willey." Willey did not testify at trial.

3

down, but that Willey continued getting up. At some point, Digsby got the gun out of his back pocket and shot Willey, and then returned the gun to his back pocket. Swindell testified that Willey did not have a weapon, and that there was never a point in the fight during which Willey was the aggressor.

After the fight was over, Digsby approached Swindell and his companion and hung up the pay phone. Swindell testified that Digsby still had the gun in his hand at that point. The police arrived a short time later, and Swindell said he pointed out to them that Digsby still had a gun in his back pocket after Digsby was handcuffed. According to Swindell, Willey never had possession of the gun. Swindell did not know any of the participants in the fight.

William Arnold, the deputy sheriff who responded to the scene, testified that he observed Digsby and another man (Willey) arguing across the street from him. Arnold observed bystanders next to a phone booth and a Jeep parked nearby. Arnold crossed the street to see what was going on.

According to Arnold, Willey was holding himself and told Arnold that Digsby had shot him. Arnold went over to Digsby, handcuffed him, patted him down, and observed a handgun pushed down in Digsby's right back pocket. Arnold removed the loaded gun from Digsby's pocket and secured it. Arnold found "[s]ome marijuana" on Digsby's person.

4

Deputy Josh Taylor also testified, and generally affirmed Arnold's testimony. Taylor added that Willey was shot twice and that Willey was "belligerent" with the police investigating the shooting.

Digbsy testified in his own defense. Digsby first met Willey on September 24, 2004, when he picked up Willey and gave him a ride to Winn-Dixie in Digsby's Jeep. Digsby and Willey both went into the Winn-Dixie, but when Digsby came out of the store, his Jeep had disappeared from the parking lot. Digsby reported the Jeep stolen, but the police told him that they were too busy in the aftermath of Hurricane Ivan to look for it. Disgby then called all of his friends to ask for their help in looking for the Jeep. Digsby received a call from a friend at 7:30 P.M. on September 29 telling him that Digsby's stolen Jeep had been spotted; the friend gave Digsby the Jeep's location.

Digsby went to retrieve the Jeep, driving a blue Ford Escort station wagon to the location where his friend reported seeing it. Digsby's brother was with him, but Digsby was driving the car. Digsby went by the phone booth and hung up the phone as soon as he got out of the car, telling Swindell and his companion "this doesn't concern y'all." Digsby denied having a gun with him when he came to the crime scene.

When Digsby and his brother saw the Jeep, Willey, whom Digsby suspected

5

of the theft, was standing nearby. Digsby confronted Willey about the Jeep and Willey pushed him, so Digsby slapped Willey with an open hand in response. When Digsby slapped Willey, Willey almost fell. When Willey came back up towards Digsby, Digsby saw a pistol in Willey's hand. Digsby grabbed the gun, and it went off in the subsequent struggle, wounding Willey. Digsby then put the gun in his left back pocket, where the police found it on his arrest.

On cross-examination, Digsby testified that he did not know Swindell before the fight, and that Swindell had no reason to testify falsely against him. Digsby did not call the sheriff's department when he heard about his Jeep being spotted because he had previously reported the theft. Digsby never saw Willey's gun until he slapped Willey and Willey came back towards him. In response to the State's questioning about how Willey could have shot himself in the side, Digsby stated that he had no idea how that could have happened.

## C. Jury Instructions and Questions at First Trial

The state trial court instructed the jury on the elements of the aggravated battery claim and on the lesser included offense of simple battery. On aggravated battery, the state court told the jury that to find Digsby guilty, they had to find (1) that Digsby intentionally touched or struck Willey against his will or intentionally caused bodily harm to Willey; and (2) in committing the battery, Digsby

6

intentionally or knowingly caused great bodily harm to Willey or used a deadly weapon. The state court also instructed the jury that if it found Digsby committed the aggravated battery and "that during the commission of the crime [Digsby] carried, displayed, used[,] threatened to use or attempted to use a firearm, you should find him guilty of aggravated battery with a firearm." The state court further explained that if the jury found Digsby committed the aggravated battery but did not use the firearm, then it should convict him only of the aggravated battery.

The state court also instructed the jury on justification and self-defense. The state court explained that it would be a defense to aggravated battery "if the injury to George Wiley [sic] resulted from the justifiable use of force likely to cause death or great bodily harm. A person is justified in using force likely to cause death or great bodily harm if he reasonably believes that such force is necessary to prevent imminent death or great bodily harm to himself or another." The state court also instructed the jury that Digsby could not use deadly force if he "initially provoked the use of force against himself unless the force asserted toward the defendant was so great that he reasonably believed that he was in imminent danger of death or great bodily harm and had exhausted every reasonable means to escape the use of force likely to cause death or great bodily harm to [Willey]."

7

The state court further explained that the jury should evaluate Digbsy's self-defense claim in light of all of the circumstances of his fight with Willey, and instructed the jury that "the appearance of danger must have been so real that a reasonably cautious and prudent person" in the same circumstances would have believed he had to use deadly force to escape the danger.

The court instructed the jury on the lesser included offense of battery and on the elements of possession of marijuana, which was Count 3. The court also instructed the jurors on the verdict form, which included three options for Count 1. The first option was to convict Digsby of aggravated battery. If the jury did that, it then had to answer three separate questions: (1) whether Digsby possessed a firearm during the battery; (2) whether Digbsy discharged the firearm during the battery; and (3) whether great bodily harm was inflicted upon Willey during the commission of the battery. The second option was to convict Digsby of the lesser included offense of battery. The third option was to acquit him of the charges under Count 1.

During deliberations, the jury asked the state trial court to answer two questions: "Is the person that started the fight the only one guilty of battery or are both participants in the fight considered guilty of battery?" and "[i]s self defense battery?" As to the first question, the state court told the jury that Digsby was the

only person charged with a crime, and that the jury could find him guilty of the lesser included offense of battery. As to the second question, the court told the jury that if Digsby acted rightfully in self-defense, that would be a defense to the aggravated battery charge and the jury could accordingly return a not guilty verdict. The jury found Digsby not guilty on the aggravated battery charge but convicted him on the drug charge. The state court sentenced Digsby to eleven months and fifteen days' imprisonment on the drug conviction.

**D. Motion to Bar Trial on Felon in Possession Charge**

After his acquittal on the aggravated battery charge, Digsby filed a motion to dismiss Count Two, the possession of a firearm by a convicted felon charge, on collateral estoppel and double jeopardy grounds. Specifically, Digsby's motion asserted that the state was collaterally estopped from prosecuting Count Two because the jury in the first trial must have believed his self-defense argument when it acquitted him. Digsby's self-defense argument was founded on his contention that Willey had initially possessed the gun and pulled it on Digsby during the fight. The state court summarily denied Digsby's motion to dismiss. A trial was held on Count 2, the charge of possession of a firearm by a convicted felon.

**E. Evidence at Trial on Count 2**

9

At Digsby's trial on the gun charge, Deputy William Arnold again testified. Arnold stated that, while on patrol, he encountered Digsby after seeing Digsby and Willey in an argument. Arnold put handcuffs on Digsby "[t]hree or four seconds" after making contact with him, and Arnold found a pistol in Digsby's back right pocket after putting the handcuffs on him. Digsby did not voluntarily give Arnold the gun. However, Digsby could not have given Arnold the gun because Arnold handcuffed Digsby immediately.

Digsby also testified at his gun trial. Digsby first asserted that he had the gun in his pocket because he "took it from Mr. Wiley [sic] and placed it in my back pocket. [Willey] was trying to shoot me with it." Digsby knew Willey because Willey had stolen his Jeep; Digsby also said that law enforcement had told him it could not help him find the Jeep. Digsby got information from an acquaintance about the whereabouts of his Jeep, and said that he found it at the corner of Mobile Highway and Green Street.

When Digsby approached Willey to ask him why Willey stole his Jeep, Willey pushed Digsby, so Digsby slapped Willey. Willey nearly fell down. As Willey came back up, Digsby saw a pistol in Willey's hand and reached for it. When Digbsy reached for the pistol, "it [shot and] hit [Willey's] leg," and Willey lost his grip on the gun; Digsby then pulled the gun out of Willey's hand and put it

10

in his back pocket. Around that time the police officer came up and handcuffed Digbsy. Digbsy also testified that he felt it was necessary to take the gun from Willey because Digsby felt like his life or safety was threatened. Digsby did not have time to think about his convicted felon status between the time he put the gun in his pocket and the police officer's arrival.

On cross-examination, Digsby admitted that he did not know Swindell, and that Swindell had a clear view of the confrontation between Digsby and Willey. Digsby denied having the gun with him when he went to confront Willey, and also denied pulling the gun to shoot Willey. Digsby reaffirmed his earlier testimony that he did not have time to voluntarily give the gun to the police officer, and said that when the officer showed up, Willey was on the ground and Digsby was backing away from Willey. Digsby said that when he put the gun in his pocket, it did not cross his mind that he was a convicted felon.

Digsby's brother Roger ("Roger") also testified. Roger stated that he was with Digsby when Digsby was arrested. When investigators from the State Attorney's office interviewed Roger, he lied and said he had not been with Digsby. Roger discussed the matter with Digsby's defense attorney, and decided to tell the truth after talking to his sister. Roger left the scene of the crime because he did not want to get in any trouble.

11

On cross-examination, Roger said he did not see that Digsby possessed a gun on the evening in question. Roger first spotted the Jeep while Digsby was driving their car at the corner of Green Street and Mobile Highway. Roger never saw a gun that evening, and after Roger heard a gun discharge, Digsby told him to leave. The rest of Roger's testimony essentially confirmed Digsby's testimony about the nature of the confrontation. Roger asserted that when Digsby approached Willey, Willey shoved Digsby, starting the fight.

Swindell also testified at Digsby's gun trial. Swindell testified that, at the time of the confrontation between Digsby and Willey, he was on a pay phone at the corner of Mobile Highway and Green Street. When Swindell and his companion had been on the phone for a time, "[t]he fellow that was shot," i.e., Willey, arrived "[i]n that Jeep . . . ." The phone booth was no more than ten feet from the Jeep. After Willey drove up, another car approached with two people inside (Digsby and Roger), and both got out. The two men got out of the car and confronted Willey about stealing the Jeep; this confrontation took place "[r]ight in front" of the phone booth. After the confrontation over the Jeep, a fight ensued, with Digsby throwing the first punch. Digsby had a gun in his back right pocket before the fight broke out. Willey never possessed a gun during the fight, and Digsby was the only person with a gun. Willey also never had any weapons on him that would have

12

justified his being shot. The only shot that Swindell heard fired was one fired point-blank into Willey's abdomen.

The state court instructed the jury on the elements of possession of a firearm by a convicted felon. The state court told the jurors that to convict Digsby, they had to determine (1) that he was previously convicted of a felony and (2) that after the conviction, Digsby had knowingly owned a firearm or had one in his care, custody, possession or control. The state court instructed the jury that it should acquit Digsby if it found that he possessed the gun out of necessity, and gave the required elements for a necessity defense. The jury found Digsby guilty of possession of a firearm by a convicted felon. The state court sentenced Digsby to ten years' imprisonment with three years' mandatory minimum sentence.

After the gun conviction, Digsby through counsel filed a notice of appeal and a "Statement of Judicial Acts to be Reviewed," pursuant to Rule 9.140(d) of the Florida Rules of Appellate Procedure. Digsby's statement identified the denial of his motion to dismiss, along with the state trial court's refusal to give a proffered jury instruction, as the issues on appeal. However, Digsby's appellate counsel did not raise either of these issues, instead arguing only that the trial court erred in permitting evidence that Digsby was previously convicted of possession of a firearm by a convicted felon. The state appellate court affirmed Digsby's gun

13

conviction without a written opinion.  Digsby v. State, 925 So. 2d 313 (Fla. Dist. Ct. App. 2006).

Digsby then filed a state post-conviction petition alleging ineffective assistance of counsel, which was denied "on the merits" by the First District Court of Appeal of Florida without written opinion.  Digsby v. McDonough, 965 So. 2d 831 (Fla. Dist. Ct. App. 2007).  Digsby subsequently filed a petition seeking a writ of  habeas corpus on the basis of ineffective assistance of counsel, which the First District Court of Appeal also expressly denied "on the merits," also without written opinion.  Digsby v. McDonough, 969 So. 2d 1195 (Fla. Dist. Ct. App. 2007).[3]

## F. Federal § 2254 Petition

On December 27, 2007, Digsby filed a petition for writ of habeas corpus under 28 U.S.C. § 2254 in federal court.  Digsby's § 2254 petition argued that he was denied effective assistance of appellate counsel in the gun case because of counsel's failure to raise the issues of double jeopardy and collateral estoppel on direct appeal in state court.  On December 15, 2008, the Magistrate Judge issued a Report and Recommendation (the "Report"), which concluded that Digsby's petition should be denied with prejudice.  Specifically, the Report stated that a rational jury in the aggravated battery case did not have to support its verdict with

---

[3]The State does not argue that Digsby failed to exhaust his claim of ineffective assistance of appellate counsel.

14

a finding that Willey possessed the gun when the fight began.   Instead, the jury could have found that Digsby had the gun when the fight started and the gun went off accidentally during the struggle.  If Digsby did have the gun when the fight began, he was guilty of possession of a firearm by a convicted felon.  Thus, Digsby's collateral estoppel claim would have been rejected on direct appeal, and Digsby's appellate counsel was not ineffective for failing to present it.

On February 9, 2009, the district court adopted the Magistrate Judge's Report and denied Digsby's § 2254 petition. This Court granted a Certificate of Appealability on this issue:

> Whether the district court erred by finding that appellate counsel was not ineffective for failing to raise on direct appeal the issue of whether collateral estoppel barred the state from prosecuting a charge of possession of a firearm by a convicted felon, after the appellant was acquitted of aggravated battery with great bodily harm and discharging a firearm?

## II. STANDARD OF REVIEW

We review a district court's grant or denial of a § 2254 petition de novo, while the court's factual findings are reviewed for clear error.  Sims v. Singletary, 155 F.3d 1297, 1304 (11th Cir. 1998).

As amended by the Antiterrorism and Effective Death Penalty Act ("AEDPA"), 28 U.S.C. § 2254(d) forbids a federal court from granting habeas relief on claims that were previously decided in state court, unless the state court

15

decision was (1) "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

## III. DISCUSSION

### A. <u>Strickland</u> Principles

Because Digsby asserts that his appellate counsel rendered ineffective assistance, our analysis begins with the familiar rule that the Sixth Amendment affords a criminal defendant the right to "the Assistance of Counsel for his defence." U.S. Const. amend. VI. Under the test set forth in <u>Strickland v. Washington</u>, 466 U.S. 668, 104 S. Ct. 2052 (1984), when a defendant claims ineffective assistance of counsel, he must show both that (1) his counsel's performance was deficient; and (2) the deficient performance prejudiced his defense. <u>Id.</u> at 687, 104 S. Ct. at 2064. "For performance to be deficient, it must be established that, in light of all the circumstances, counsel's performance was outside the wide range of professional competence." <u>Putman v. Head</u>, 268 F.3d 1223, 1243 (11th Cir. 2001). Courts must be highly deferential in reviewing counsel's performance, and must apply the strong presumption that counsel's performance was reasonable. <u>Chandler v. United States</u>, 218 F.3d 1305, 1314

16

(11th Cir. 2000) (en banc).  Under the prejudice prong, the defendant must show "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  Strickland, 466 U.S. at 694, 104 S. Ct. at 2068.

Our standard of review is "doubly deferential" when "a Strickland claim [is] evaluated under the § 2254(d)(1) standard."  Knowles v. Mirzayance, 556 U.S. __, 129 S. Ct. 1411, 1420 (2009).  "The question is not whether a federal court believes the state court's determination under the Strickland standard was incorrect but whether that determination was unreasonable – a substantially higher threshold."  Id. (quotation marks omitted).

## B. Collateral Estoppel Principles

To determine whether Digsby's appellate counsel rendered ineffective assistance, we first assess the strength of the collateral estoppel claim that Digbsy asserts his appellate counsel should have raised in his state direct appeal.  Only if failure to bring the claim both rendered counsel's performance deficient and resulted in prejudice to Digsby was there ineffective assistance.

"The doctrine of collateral estoppel is a narrow exception to the Government's right to prosecute a defendant in separate trials for related conduct."  United States v. Brown, 983 F.2d 201, 202 (11th Cir. 1993).  It is a bar to

17

prosecution only if "a fact or issue necessarily determined in the defendant's favor in the former trial is an essential element of conviction at the second trial." Id. In deciding whether collateral estoppel applies, we first "must examine the verdict and the record to see what facts, if any, were necessarily determined in the acquittal at the first trial." United States v. Ohayon, 483 F.3d 1281, 1286 (11th Cir. 2007) (quotation marks omitted). Second, we "must determine whether the previously determined facts constituted an essential element of the second offense." Id. (quotation marks omitted).

Put another way, "'[w]here a previous judgment of acquittal was based upon a general verdict,'" a court must consider "'whether a rational jury could have grounded its verdict upon an issue other than that which the defendant seeks to foreclose from consideration.'" Id. (quoting Ashe v. Swenson, 397 U.S. 436, 444, 90 S. Ct. 1189, 1194 (1970)). In making this determination, the court must examine the record of the prior proceeding and other relevant matters. Ohayon, 483 F.3d at 1286. After examining this record, the court "must decide whether it can ascertain the basis of the acquittal at the first trial." Brown, 983 F.2d at 202. Only if the jury's acquittal in the first trial was based upon reasonable doubt about an element essential to conviction in the second trial does collateral estoppel apply. Id.

18

## C. Digsby's Appellate Counsel

In this case, we cannot say that the state courts' refusal to grant relief on the basis of ineffective assistance of appellate counsel was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," as required for Digsby to be entitled to habeas relief. 28 U.S.C. § 2254(d)(1).[4] This is because Digsby has not shown collateral estoppel bars his gun conviction, and thus his appellate counsel was not ineffective for not raising the collateral estoppel claim on appeal.

In this context, Digsby's collateral estoppel claim depends on a finding that the jury in the first trial "necessarily determined" that he did not possess a firearm during his fight with Willey, and that possession of a firearm was "an essential element" of his conviction for felon-in-possession-of-a-firearm. Ohayon, 483 F.3d at 1286. Possession of a firearm was certainly an essential element of Digsby's conviction in the second trial. See Fla. Stat. § 790.23 (defining crime of possession of a firearm by a convicted felon). Thus, the question here is only whether the jury in the first trial necessarily determined that Digsby never possessed a firearm during his confrontation with Willey.

Digsby argues that "[t]he only factual basis for the jury's verdict of not

_____

[4]Alternatively, even if de novo review applies, we would affirm the district court's denial of Digsby's § 2254 petition.

19

guilty as to Count 1 [aggravated battery] was the Defendant's assertion of self-defense." From this, he argues that the jury necessarily determined that he did not unlawfully possess the firearm before, during, or after his confrontation with Willey.

Despite Digsby's assertions, we cannot "ascertain the basis of the acquittal" in his first trial, and therefore cannot say that collateral estoppel applies. Brown, 983 F.2d at 202. While the jury in the first trial may have concluded that Digsby did not unlawfully possess the firearm, it did not necessarily make that conclusion, and collateral estoppel does not apply. See Ohayon, 483 F.3d at 1286 (stating that collateral estoppel applies only when the jury necessarily decided a fact in favor of a defendant and that fact is an essential element of the offense in the second trial).

It is well-established that a jury may believe a witness's testimony in whole or in part. United States v. Brown, 53 F.3d 312, 316 (11th Cir. 1995). Here, for example, the jury could have believed Swindell's testimony that he initially saw the gun in Digsby's back pocket, thereby establishing unlawful possession at the outset of the confrontation, and still concluded that the firearm accidentally went off in the course of the physical altercation between Digsby and Willey. That is only one of a number of scenarios suggesting the possibility that Digsby unlawfully possessed the firearm at the start of the fight, and still that Digsby never

20

unlawfully brandished or used the weapon during the ensuing struggle.

Accordingly, we conclude that the gun possession issue was not "necessarily determined in [Digsby's] favor" in the first trial, because we cannot "ascertain the basis of [his] acquittal." Brown, 983 F.2d at 202. Because a rational jury in the first case could have grounded its verdict on an issue other than the one which Digsby seeks to foreclose from consideration, his collateral estoppel claim fails. See Ohayon, 483 F.3d at 1286 (stating standard for application of collateral estoppel).

Because Digsby's collateral estoppel claim fails, he cannot demonstrate that his appellate counsel's failure to bring the collateral estoppel claim on direct appeal was deficient performance or that it prejudiced his defense. See Strickland, 466 U.S. at 687–88, 694, 104 S. Ct. at 2064, 2068. Thus, the state courts' determination that Digsby did not receive ineffective assistance from appellate counsel was not "contrary to, or . . . an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1).

Because Digsby has not shown that the state courts' rejection of his ineffective appellate counsel claim was contrary to, or an unreasonable application of, Strickland or other clearly established federal law, we cannot grant habeas

relief.  Accordingly, we affirm the district court's denial of Digsby's § 2254 petition.

**AFFIRMED.**