[DO NOT PUBLISH]

In the

# United States Court of Appeals

### For the Eleventh Circuit

_____

No. 22-10944

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

*versus*

SEAN KERWIN BINDRANAUTH,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida
D.C. Docket No. 4:19-cr-10016-KMM-1

_____

Before WILSON, GRANT, and LAGOA, Circuit Judges.

PER CURIAM:

Sean Bindranauth was convicted of multiple money laundering offenses and sentenced to 180 months' imprisonment. He now appeals his convictions and sentence, raising two issues. First, he argues that the district court erred by giving an unwarranted jury instruction on deliberate ignorance that was further aggravated by supplemental instructions that misstated the law. Second, he contends that the district court committed reversible error by miscalculating the Sentencing Guidelines. After careful review, and with the benefit of oral argument, we affirm Bindranauth's convictions and sentence.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

From February 2018 through September 2019, Bindranauth operated a money laundering scheme from Key West, Florida. His co-conspirators perpetrated investment or romance scams on social media, engendering trust with victims to eventually induce them into sending or delivering something of value. The victims were instructed to send money to Bindranauth, who received the fraudulent proceeds.

The government never alleged that Bindranauth himself participated in the underlying online scams that induced the victims, but his defense did not deny their existence at trial. Bindranauth ultimately laundered around one million dollars of traceable funds, including from many victims that did not testify. At trial, the government called six witnesses who were victims of

either romance or investment scams and who sent money to Bindranauth.

For instance, Dorothy Bates met "Nicholas Strickland" on Facebook and believed that they were in a romantic relationship. At Strickland's request, Bates sent $15,000 in March 2018 and then $38,000 in May 2018 to Bindranauth to finance transporting food to an island. Karen Webster received a "follow" request from "Peter Clark" on Instagram. Clark asked for financial support to fund a private plane to the United States from the United Kingdom due to alleged issues in security and customs. Webster sent multiple wires to multiple individuals, including Bindranauth in September 2018. In total, she sent $53,000 for the "private plane." Kathleen Tucker met "Nick Vanterheyden," allegedly a doctor based in Afghanistan, on the online game Words with Friends. They developed a romantic relationship, and he asked her to help pay for a courier to move a large sum of money that he had in Afghanistan. Tucker sent a total of $200,000 to multiple individuals, including two payments in January 2019 to Bindranauth that totaled $36,000. Lastly, Kathleen Houser met a man named "Miguel" on Facebook in January 2018. They discussed purchasing a home together in Tuscon, Arizona, and Miguel asked her for $15,000 to help someone else buy a truck. She sent $16,000 to Bindranauth with the notation "fixed my pool" in January 2019 after Miguel told her to lie about the reason for sending the money. Houser's bank blocked the transaction as suspicious activity.

In total, Bindranauth sent $47,823 through Western Union and MoneyGram while directing others to send a total of $211,284 through Western Union and MoneyGram. Through his bank accounts, Bindranauth sent or withdrew a total of $914,227.51. He sent or withdrew additional amounts through non-traceable funds such as "ATM withdrawals, cash withdrawals, [and] cash advance[s]."

The money was laundered through transfers to bank accounts in Nigeria provided by co-conspirator Nancy Turney. Turney gave Bindranauth the bank account information for him to route the incoming wires to and kept close tabs on the funds that he laundered. The government's theory was that Turney worked with other co-conspirators to defraud the victims and launder the money through Bindranauth.

Bindranauth referred to Turney as his "wifey" and "fiancé[e]" in communications. They regularly communicated as though they shared a romantic relationship. However, law enforcement explained at trial, "Nancy Turney, at the very least, is a Facebook page that Mr. Bindranauth communicates with willingly. As far as who controls it, we don't know that. . . . But as far as the concept of the physical person of Nancy Turney, as it's portrayed by Mr. Bindranauth, we're relatively certain that person doesn't exist."

Bindranauth's methods of transferring funds evolved over time. At first, he transferred money through MoneyGram and Western Union both by himself and through others working at his

direction.  As of August 2018, the only bank account he had open, at the Monroe County Federal Teachers Credit Union, did not allow him to send money internationally.  Bindranauth then opened five additional accounts to wire funds through.

He first opened an account with Iberia Bank.  The bank closed the account in October 2018 because of a security request based on suspicious activity, namely, the rapid movement of funds and unusual wire activity.  He then opened a Bank of America account in October 2018, which he stopped using in February 2019.  Bindranauth opened a Wells Fargo account in January 2019 which the bank closed the next month due to suspected fraud.  Wells Fargo sent several notifications to Bindranauth advising him that the bank closed the account because "one or more money transfers to [his] account [were] reported as unauthorized."  He opened a BB&T account in February 2019, which closed in May 2019.  Finally, he opened an account with First State Bank in May 2019, which the bank shut down in a few weeks after two suspicious wires of around $7,000 each.

Law enforcement agents detected no evidence of "legitimate incoming sources" in these accounts.  From these accounts, Bindranauth wired money to a United Bank for Africa account associated with an individual named Olukayode Ayodele Michael ("Mr. Michael") along with other individuals based in Nigeria.  He did not send money to an account under Nancy Turney's name and had no family or business ties to Mr. Michael specifically or Nigeria generally.  He also pulled cash from these accounts and used the

accounts to make personal purchases and payments on his Toyota truck and phone.

All told, Bindranauth laundered about one million dollars, and according to the plan's design, he intended to pocket three percent of the laundered funds, amounting to about $30,000. In one interview with law enforcement, he said he already spent much of his cut from the overall scheme.

Bindranauth admitted recruiting individuals to send money for him. Tristan Vergara sent $1,000 multiple times at Bindranauth's direction. Bindranauth paid him $20 for each transaction, drove him to make the transactions, and directed him with the name and banking information for the receiving end of the wire. On multiple occasions in the spring of 2018, Bindranauth also drove and directed James Sweeting to make transactions, paying him $20 each time. Bindranauth recruited his mother and aunt to send money for him too. Crystal Hernandez, who was living with him and apparently in a romantic relationship with him, also sent money on his behalf.

On January 24, 2020, a federal grand jury returned a ten-count superseding indictment against Bindranauth, charging him with conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h) (Count One); money laundering, in violation of 18 U.S.C. §§ 1956(a)(1)(B)(i) and 2 (Counts Two-Nine); and engaging in the business of money remittance or transmitting without a license, in violation of 18 U.S.C. §§ 1960(a) and 2 (Count Ten).

Bindranauth proceeded to trial, which lasted four days. In its case-in-chief, the government offered the testimony of fourteen witnesses and introduced exhibits that included bank statements, Facebook messages, and two video interviews between Bindranauth and Homeland Security Investigations agents. Bindranauth offered the testimony of two witnesses of his own.

At the conclusion of trial, the district court instructed the jury, including instructions on both actual knowledge and deliberate ignorance. For the deliberate ignorance instruction, the court used the "Deliberate Ignorance as Proof of Knowledge" Eleventh Circuit pattern instruction. During the jury deliberations, the district court received the following note from the jury:

> Would like clarity on statement on p. 23 of Judge's instructions. 'But I must emphasize that negligence, carelessness or foolishness isn't enough to prove that the Defendant knew.' Can we have elaboration on how this applies to 'Deliberate avoidance of positive knowledge.'

The district court discussed the note with the parties, then brought in the jury to elaborate on the deliberate ignorance instruction. The district court provided the jury with the following explanation:

> So if somebody was really stupid enough to, let's say, be in Colombia, South America—they're American, coming back to the United States, and somebody comes to them and says, will you please take this package off the plane for me and I will pay you $1,000; and you say, Sure why not, you know.

And I'm deaf, dumb and blind, and I go ahead and do it, and I was stupid enough to do that and I get through Customs and they find out that there's drugs in the package, maybe that person is negligent, careless, or foolish, in which case, he didn't know something that some other person might know.

After the district court provided the supplemental instruction, Bindranauth's counsel requested a sidebar and stated the following to the court:

I agree, and don't take any issue to the description of someone may be deaf, dumb, and blind can be foolish, but the standard also says that there can be negligence; and I'm concerned that maybe by saying unless he was deaf, dumb, and blind, then he was being deliberately ignorant. I would like the jurors to understand that if he was negligent that it doesn't have to go to --

The district court interjected by asking, "Was that in?" Bindranauth's counsel responded, "No, you didn't, you said careless and foolish." The district court then reminded the jury to consider the instructions as a whole and not focus solely on the deliberate ignorance instruction. And the district court repeated for a third time that negligence, carelessness, or foolishness was not enough to prove deliberate ignorance. Bindranauth raised no further objection to the supplemental instruction and the district court dismissed the jury to return to its deliberations.

The jury returned a verdict finding Bindranauth guilty of conspiracy to commit money laundering (Count 1). It found him

not guilty of two substantive money laundering counts (Counts 2 and 3), but guilty of the remaining money laundering counts (Counts 4-9). The jury also found him guilty of operating an unlicensed money transmitting business (Count 10).

Prior to the sentencing hearing, a probation officer prepared a Presentence Investigation Report ("PSI"). The PSI grouped Counts One and Four through Ten and set the base offense level at 22 under U.S.S.G. § 2S1.1. The PSI then applied (1) a four-level increase under U.S.S.G. § 2S1.1(a)(2) for being "in the business of laundering funds"; (2) a two-level increase under U.S.S.G. § 2S1.1(b)(3) because the offense involved "sophisticated laundering"; (3) a two-level increase under U.S.S.G. § 3A1.1(b)(1) because Bindranauth "knew or should have known that a victim of the offense was a vulnerable victim"; and (4) a four-level increase under U.S.S.G. § 3B1.1(a) because Bindranauth "was a leader or organizer and the criminal activity involved five or more participants or was otherwise extensive." Bindranauth's total offense level was 34.

Bindranauth's criminal history included six previous convictions. Bindranauth's first four convictions for petit theft, marijuana possession, driving with a suspended license, and battery did not score criminal history points. Bindranauth received a total of three criminal history points from two convictions including two counts of marijuana possession, two counts of possession of narcotic equipment, and one count of possession of narcotics. Bindranauth committed the money laundering offenses while under a criminal justice sentence, so two points were added pursuant to § 4A1.1(d).

In sum, Bindranauth had five criminal history points, placing him in criminal history category III. The advisory guideline range for Bindranauth's sentence was 188 to 235 months' imprisonment. The statutory range, if sentences for each count ran concurrently, was zero to 240 months' imprisonment.

Bindranauth filed written objections, challenging each of the four adjustments applied to his offense level, and the government responded. The district court then held a sentencing hearing. During the hearing, after defense counsel had presented its arguments on the first enhancement, the district court announced that:

> In the event that this matter is taken up on appeal, and any one or more of this Court's objections is overruled—in fact, on appeal, that the appellate Court would have the benefit of this Court's ruling, that it would have imposed the same sentence, in any event, as . . . a reasonable sentence based on [the] 3553(a) factors.

The district court then overruled Bindranauth's objection to the four-level enhancement for being in the business of laundering funds, noting "multiple sources, multiple banks, does not suggest an isolated instance of money laundering." The district court also overruled Bindranauth's objection to the two-level enhancement for sophisticated laundering.

The district court did, however, sustain the objection to the two-level vulnerable victim enhancement. The district court also overruled Bindranauth's objection to the four-level enhancement for his role as a leader or organizer in a criminal activity that

involved five or more participants or was otherwise extensive. The final offense level was 32 with a criminal history category III, which made the advisory guidelines range 151 to 188 months' imprisonment.

Bindranauth addressed the district court, and two witnesses spoke on his behalf. Bindranauth's counsel asked the district court to impose a sentence of no more than sixty months. The government advocated for a sentence within the guidelines range.

The district court sentenced Bindranauth to a term of imprisonment of 180 months as to each of Counts One and Counts Four through Nine, and to 60 months' imprisonment as to Count Ten, with all counts to run concurrently. Bindranauth renewed his objections to the three enhancements that the court overruled in calculating the guidelines range.

This timely appeal followed.

## II.    STANDARDS OF REVIEW

Several standards of review govern this appeal. We review de novo whether evidence supports a deliberate ignorance instruction. *United States v. Stone*, 9 F.3d 934, 937 (11th Cir. 1993). But our review of jury instructions is deferential, and we will reverse only if "left with a substantial and eradicable doubt as to whether the jury was properly guided in its deliberations." *United States v. Crabtree*, 878 F.3d 1274, 1289 (11th Cir. 2018) (quoting *United States v. Steed*, 548 F.3d 961, 977 (11th Cir. 2008)). And when "a party did not object to a jury instruction in the district court, we review that instruction for plain error." *United States v. Prather*, 205 F.3d 1265,

1270 (11th Cir. 2000). "The district court has broad discretion in formulating a jury charge as long as the charge as whole is a correct statement of the law." *Crabtree*, 878 F.3d at 1289 (quoting *United States v Perez-Tosta*, 36 F.3d at 1552, 1564 (11th Cir. 1994).

When reviewing Sentencing Guidelines issues, we "review legal questions de novo, factual findings for clear error, and the district court's application of the guidelines to the facts with due deference, which is 'tantamount to clear error review.'" *United States v. Isaac*, 987 F.3d 980, 990 (11th Cir. 2021) (quoting *United States v. Rothenberg*, 610 F.3d 621, 624 (11th Cir. 2010)). "The government bears the burden of establishing by a preponderance of the evidence the facts necessary to support a sentencing enhancement." *United States v. Kinard*, 472 F.3d 1294, 1298 (11th Cir. 2006).

## III.    ANALYSIS

On appeal, Bindranauth raises two issues. First, he argues that the district court erred by giving an unwarranted jury instruction on deliberate ignorance that was further aggravated by supplemental instructions that misstated the law. Second, he contends that the district court committed reversible error by miscalculating the Sentencing Guidelines. We address each argument in turn.

### A.  The Instructions on Deliberate Ignorance

Bindranauth's convictions for money laundering and conspiracy to commit money laundering required the government to prove that Bindranauth knowingly transacted funds that were the proceeds of some form of unlawful activity. *See United States v. Tarkoff*, 242 F.3d 991, 994 (11th Cir. 2001) (listing the elements of an 18

U.S.C. § 1956(a)(1)(B)(i) offense); *United States v. Broughton*, 689 F.3d 1260, 1280 (11th Cir. 2012) (listing the elements of an 18 U.S.C. § 1956(h) offense). To satisfy the knowledge element, the government had to show that Bindranauth knew the funds came from "some form of unlawful activity" but he did not need to know the exact nature of the crime from which the money was derived. *See* 18 U.S.C. § 1956(a)(1). On appeal, Bindranauth argues that the government failed to prove that he knew that his financial transactions involved illegal proceeds.

As an initial matter, the evidence presented at trial supported actual knowledge by Bindranauth. The evidence presented at trial suggested that Bindranauth knew the funds he laundered were illegal proceeds. The government presented evidence including Bindranauth's own repeated acknowledgments that he might have been involved in a scam with Nancy Turney, and Bindranauth's continued activity after repeated warnings by banks, friends, family, and law enforcement, that his conduct was illegal.

As one example, Wells Fargo closed his account a month after he opened it, due to suspected fraud.[1] Wells Fargo sent several notifications to Bindranauth advising him that the bank closed the account because "one or more money transfers to [his] account [were] reported as unauthorized." His personal communications indicated that he knew why the banks had closed his accounts. For instance, in October 2018, Bindranauth told Turney, "Baby, I went

---

[1] In total, the evidence showed that Bindranauth opened five bank accounts, four of which were later shut down for suspicious activity.

to the bank. They told me the money is in there and I can't get it until the people that said I'm doing a fraud with the other bank release my account." In December 2018, he told her, "I do not want the bank to say anything to me about money laundering, then I will be pissed off." By all accounts, the circumstances of the transactions made it plausible for a jury to conclude that Bindranauth knew he laundered illegal funds. *See, e.g.*, *United States v. Puche*, 350 F.3d 1137, 1143–44 (11th Cir. 2003) (finding sufficient evidence to sustain a money laundering conviction where the jury could infer intent from the large volume of transfers, their frequency, and other suspicious features). Even setting aside Bindranauth's clear communications referencing possible fraud or money laundering, a jury could have determined that Bindranauth must have known there was some fraudulent explanation for the money arriving in his account from strangers based on the nature of his "work" with his co-conspirators.

Bindranauth argues that the district court erred by giving a deliberate ignorance jury instruction, over his objection, because he proactively sought out information about whether he was committing a criminal act. He asserts that he sought information and assurances from Turney repeatedly in response to questions and concerns that he received from friends, family members, and banks. He also contends that the record contained no evidence that he purposefully attempted to avoid learning all of the facts.

A deliberate ignorance instruction is appropriate when the facts "support the inference that the defendant was aware of a high

probability of the existence of the fact in question and purposely contrived to avoid learning all of the facts in order to have a defense in the event of a subsequent prosecution." *United States v. Rivera*, 944 F.2d 1563, 1571 (11th Cir. 1991) (quoting *United States v. Alvarado*, 838 F.2d 311, 314 (11th Cir. 1987)).  It is not error to give the instruction "when the evidence could support both actual knowledge or deliberate ignorance and the jury was instructed on both." *United States v. Maitre*, 898 F.3d 1151, 1157 (11th Cir. 2018).

As Bindranauth points out, "[t]he record is replete with examples of [him] actively seeking information and assurance from Nancy" that he was not committing a crime.  Bindranauth provides examples such as when he asked Nancy if he was "doing money laundering."  He also points to when he asked her "what's going on" in response to a bank official *telling him that he was committing wire fraud*.  But this is precisely the evidence that warranted the deliberate ignorance instruction.  Bindranauth concedes that he was warned repeatedly, by friends, family members, and banks, that he was potentially engaging in illicit activity.  Yet, he chose to ignore it.

Here, the circumstantial evidence also suggested actual knowledge. Bindranauth, however, argued that, despite the optics, he never knew that he was participating in a money laundering scheme.  For his defense, he directed the jury to his communications with Nancy Turney that suggested that he was unaware of the precise nature of his activity.  It was therefore for the jury to determine whether this ignorance was feigned.  To enable the jury

to make that determination, the district court properly instructed that the jury could find knowledge if it determined that Bindranauth's failure to learn the true facts was conscious avoidance on his part.

Since the evidence supported actual knowledge, if Bindranauth is right that his conduct did not warrant a deliberate ignorance instruction, then his "contention contains the basis of its denial." *Stone*, 9 F.3d at 938. If, as he contends, there was insufficient evidence that he was deliberately ignorant of the money laundering scheme, then our precedent is clear that the jury must have convicted on the alternative theory of actual knowledge. *See United States v. Colston*, 4 F.4th 1179, 1192 (11th Cir. 2021). The district court therefore committed no reversible error when it gave a deliberate ignorance jury instruction.

### B.  Supplemental Jury Instructions

Turning to the supplemental instructions, Bindranauth argues that the district court misled the jury by providing an erroneous explanation of the law in response to the jury question on deliberate ignorance.

As an initial matter, the parties dispute whether Bindranauth objected to the supplemental instruction below. Whether the challenge is persevered or unpreserved determines whether our review is for an abuse of discretion, *See United States v. Lopez*, 590 F.3d 1238, 1247 (11th Cir. 2009), or for plain error. *See United States v. Schlei*, 122 F.3d 944, 973 (11th Cir. 1997).

On appeal, Bindranauth argues that the district court's reference to being "deaf, blind, and dumb" misled the jury to believe that one must be physically incapacitated to be negligent, careless, or foolish. Based on the wording of the purported objection below, however, it appears that he was objecting to the court's failure to specifically reference negligence in its supplemental instruction. Indeed, following the supplemental instruction, Bindranauth's counsel requested a side bar and stated: "I agree, and don't take any issue to the description of someone may be deaf, dumb, and blind can be foolish." The transcript indicates that Bindranauth's claimed objection to the supplemental instruction consisted of merely prodding the court to explain that negligence, carelessness or foolishness is not enough. This is further supported by the district court's next statement to the jury, following the sidebar, where it reiterated that it "must emphasize negligence, carelessness, or foolishness isn't enough to prove the defendant knew." After the district court provided that clarifying statement at Bindranauth's request, the court dismissed the jury to continue its deliberations.

Here, Bindranauth never objected to the supplemental instruction, let alone to the specific language that he now challenges on appeal. And "to preserve an objection to jury instructions for appellate review, a party must object before the jury retires, stating distinctly the specific grounds for the objection." *Schlei*, 112 F.3d at 973 (quoting *United States v. Starke*, 62 F.3d 1374, 1380-81 (11th Cir. 1995)). Even where a defendant objects to a jury instruction in the district court, we review for plain error if that objection was "on

different grounds than the ones he raises on appeal." *United States v. Baston*, 818 F.3d 651, 661 (11th Cir. 2016). We thus conclude that plain error review applies because Bindranauth failed to object to the use of "deaf, dumb, and blind" in the supplemental instruction by arguing that the jury would be misled into believing that it could not find negligence, carelessness, or foolishness unless Bindranauth was physically incapacitated.

Under plain error review, we ask whether there was (1) error, that (2) was plain, (3) affected the defendant's substantial rights, and (4) seriously affected the fairness of the judicial proceedings. *United States v. Pena*, 684 F.3d 1137, 1151 (11th Cir. 2012). Here, the court did not plainly err in giving its supplemental instruction because Bindranauth cannot show that any error affected his substantial rights. Satisfying the substantial rights prong of the plain error test is "anything but easy" and "almost always requires" that the alleged error affected the outcome of the district court proceedings. *United States v. Rodriguez*, 398 F.3d 1291, 1299 (11th Cir. 2005). And it is the defendant who bears the burden of persuasion regarding the third prong. *Id*. Bindranauth cannot carry that burden here. As noted above, the evidence was sufficient to convict Bindranauth based on his actual knowledge, so he cannot demonstrate that the result would be any different if the court had never given the supplemental instruction.

Even assuming the challenge to the supplemental instruction is preserved, we conclude that there is no reversible error. "A trial court enjoys broad discretion to formulate jury instructions

provided those instructions are correct statements of the law." *United States v. Lebowitz*, 676 F.3d 1000, 1014 (11th Cir. 2012)). And we defer to district courts "on questions of phrasing." *Prather*, 205 F.3d at 1270. When jury instructions, taken together, accurately state the applicable law, "there is no reason for reversal even though isolated clauses may, in fact, be confusing, technically imperfect, or otherwise subject to criticism." *United States v. Gibson*, 708 F.3d 1256, 1275 (11th Cir. 2013) (quoting *United States v. Beasley*, 72 F.3d 1518, 1525 (11th Cir. 1996)).

Reviewing the supplemental instruction in light of the entire jury charge, as we must, we are not left "with a substantial and ineradicable doubt as to whether the jury was properly guided in its deliberations." *See Lopez*, 590 F.3d at 1248. (quoting *United States v. Grigsby*, 111 F.3d 806, 814 (11th Cir. 1997)). Notably, at Bindranauth's request following the supplemental instruction, the district court repeated for a third time that the jury could not find Bindranauth's deliberate avoidance of positive knowledge merely because of "negligence, carelessness, or foolishness." Juries are presumed to follow the instructions given to them by district judges. *United States v. Ramirez*, 426 F.3d 1344, 1352 (11th Cir. 2005). Therefore, we presume here that the jury understood that it could not convict based on negligence, carelessness, or foolishness, and that it convicted because the evidence suggested that Bindranauth either knew of, or else purposefully avoided knowing, the nature of his conduct. Accordingly, we conclude that the jury was not misled in its deliberations, and we affirm Bindranauth's convictions.

### C.    The Sentencing Enhancements

Bindranauth also argues that the district court committed several errors in calculating the applicable sentencing guidelines. He contends that the court misapplied enhancements for being "in the business of laundering funds" under U.S.S.G. § 2S1.1(b)(2)(C), for "sophisticated laundering" under U.S.S.G. § 2S1.1(b)(3), and for being an "organizer or leader" under U.S.S.G. § 3B1.1(a).   Bindranauth further asserts that the district court made an invalid finding under *United States v. Keene*, 470 F.3d 1347 (11th Cir. 2006), which cannot shield its sentencing errors from appellate review. For the reasons below, we conclude that the district court's sentencing enhancements do not require reversal.

### 1.  The "Business of Laundering Funds" Enhancement

Section 2S1.1(b)(2)(C) of the Sentencing Guidelines provides for a four-level enhancement if the defendant was "in the business of laundering funds."  We look to the totality of circumstances to determine whether a defendant was in the business of laundering funds.  *See* U.S.S.G. § 2S1.1, cmt. n.4(A).  The commentary lists six *non-exclusive* factors for courts to consider, including whether the defendant: (1) regularly engaged in laundering funds; (2) laundered funds for an extended period of time; (3) engaged in laundering funds from multiple sources; and (4) generated a substantial amount of revenue in return for laundering funds.  U.S.S.G. § 2S1.1, cmt. n.4(B)(i)-(iv).

Bindranauth concedes that he "may satisfy" the second factor, but he asserts that the length of his money laundering scheme alone was insufficient to support the enhancement. We disagree.

First, Bindranauth did engage in laundering funds with regularity. We have defined "regularly" as "more than isolated, casual, or sporadic activity." *See United States v. Saunders*, 318 F.3d 1257, 1265 (11th Cir. 2003) (quoting *United States v. St. Cyr*, 977 F.2d 698, 703 (1st Cir. 1992)). And "[i]n exploring the regularity of a defendant's illegal operations—the most important factor—the stolen goods need not be the defendant's sole or even dominant source of income." *Id*. The evidence at trial showed that Bindranauth engaged in the laundering of funds repeatedly, resulting in convictions for six separate counts that each related to a specific illicit transaction. He received funds from several suspicious sources and sent money through bank wires, money orders, and other means, to individuals with bank accounts in Nigeria for more than a year and a half.

For similar reasons, Bindranauth satisfies the second factor because he laundered funds for an extended period of time, from February 2018 to September 2019. § 2S1.1, cmt. n.4(B)(i)-(ii); *see Saunders*, 318 F.3d at 1265. Third, Bindranauth laundered funds from multiple sources. § 2S1.1, cmt. n.4(B)(iii). Six individuals testified that they deposited money to Bindranauth's accounts after being victimized by his coconspirators. And his victims were not limited to the individuals that testified at trial. At sentencing, the district court noted that the Iberia Bank investigation was sparked

by evidence that multiple suspected fraud victims wired money to Bindranauth along with law enforcement's confirmation that Bindranauth received fraudulent proceeds from various sources. As to the fourth factor, Bindranauth admitted to law enforcement that he received three percent of the fraudulently acquired proceeds, generating nearly $30,000, which could be considered a substantial amount of revenue in return for laundering funds. *See* § 2S1.1, cmt. n.4(B)(iv).

In applying the enhancement, the district court remarked that multiple sources and multiple banks did "not suggest an isolated instance of money laundering." The court did not clearly err in applying the facts to the guideline provision here. Accordingly, we affirm its imposition of the enhancement.

### 2. The "Sophisticated Laundering" Enhancement

Bindranauth next objects to the district court's application of the sentencing enhancement for sophisticated laundering. The guidelines define sophisticated laundering as "complex or intricate offense conduct pertaining to the execution or concealment of the 18 U.S.C. § 1956 offense," typically involving the use of "fictitious entities," "shell corporations," "two or more levels (i.e., layering) of transactions," or "offshore financial accounts." U.S.S.G. § 2S1.1, cmt. n.5(A).

Bindranauth argues that his conduct "involved none of the above—no fictious entities; no shell corporations; no layered transactions; and no offshore financial accounts." Therefore, he contends, his actions "were the opposite of sophisticated" and the

district court erred in applying the enhancement.  The record, however, indicates that Bindranauth layered his transactions.

In remarking on a sophisticated means enhancement in *United States v. Campbell*, 491 F.3d 1306 (11th Cir. 2007), we saw "no difference between 'hiding assets or transactions . . . through the use of fictitious entities, corporate shells, or offshore financial accounts,' and hiding assets or transactions *through the use of a straw man* or campaign fund."  *Id*. at 1316 (emphasis added) (quoting U.S.S.G. § 2T1.1, cmt. n.4).  At trial, the evidence showed that Bindranauth recruited, directed, and paid at least twenty individuals to receive and send money on his behalf.  In other words, Bindranauth hired others to act as "straw men" to conceal the broader money laundering scheme.  Namely, when Bindranauth was prohibited from sending money to Turney via Western Union or MoneyGram, he located friends and family members who would send the money on his behalf, and he would pay some of them $20 to compensate them for their actions.  *See* § 2S1.1, cmt. n. 5(A)(iii).  Bindranauth received victims' funds, then withdrew the funds and wrote himself checks, before sending the money to Nigeria via money orders.  To do so, he used others to send the money that he had received via check and had deposited into his Monroe County Teachers' Credit Union Bank account.  By using others to send money to Nigeria on his behalf, Bindranauth "layer[ed]" the transactions to avoid raising suspicion and to hide his involvement in the money laundering scheme.  *See, e.g.*, *United States v. Feldman*, 931 F.3d 1245, 1263–64 (11th Cir. 2019) (holding that the sophisticated

money laundering enhancement applied to a defendant who used a company to funnel salaries and commissions).

On these facts, the district court did not clearly err in finding that the scheme involved "two or more levels . . . of transactions," so we affirm its application of the sophisticated laundering enhancement. *See* U.S.S.G. § 2S1.1, cmt. n. 5(A)(iii).

### 3. The "Leader or Organizer" Enhancement

Finally, Bindranauth also challenges the district court's finding that he was an organizer or leader of the scheme. Section 3B1.1(a) provides for a four-level enhancement if a "defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive." U.S.S.G. § 3B1.1(a). Bindranauth argues that he was not a leader or organizer because the individuals that he recruited to assist him were not "participants" because they were not criminally responsible for the offense, and their participation was de minimis.

District courts examine whether a defendant was an organizer or leader by considering the following factors:

> (1) the exercise of decision making authority, (2) the nature of participation in the commission of the offense, (3) the recruitment of accomplices, (4) the claimed right to a larger share of the fruits of the crime, (5) the degree of participation in planning or organizing the offense, (6) the nature and scope of the illegal activity, and (7) the degree of control and authority exercised over others.

*United States v. Gupta*, 463 F.3d 1182, 1198 (11th Cir. 2006) (quoting U.S.S.G. § 3B1.1, cmt. n.4).  The factors are nonexclusive, and there may be more than one leader in an organization.  *See United States v. Dixon*, 901 F.3d 1322, 1348 (11th Cir. 2018); U.S.S.G. § 3B1.1, cmt. n.4.

Several factors apply to Bindranauth's role in the scheme. Bindranauth exercised decision-making authority, as shown by his exchange with Turney where he took charge to determine how they would address Kathleen Houser's report of fraud.  His offenses involved the coordination and recruitment of multiple people, and two witnesses testified that Bindranauth drove them to the banks and paid them to execute transactions on his behalf.  Bindranauth received a larger share of the profits, paying his accomplices $20 while he received three percent of the proceeds.  And numerous text messages support the conclusion that Turney and Bindranauth planned and organized some of the offenses, and the record suggests that Bindranauth's offense affected hundreds of people.  Although Turney was directly involved in defrauding the victims, her role as a leader or organizer does not foreclose the possibility that Bindranauth was also a leader or organizer of the conspiracy.

Of those directed by Bindranauth alone, the scheme involved at least twenty other participants who laundered money. On appeal, Bindranauth focuses on the lack of criminal responsibility of the accomplices he recruited, which, he argues, is necessary for those accomplices to be "participants" under the guideline.

The guideline, however, also allows for the imposition of the enhancement if the defendant "plays a leadership role and the operation 'is otherwise extensive.'" *United States v. Holland*, 22 F.3d 1040, 1045 (11th Cir. 1994) (quoting U.S.S.G. § 3B1.1(a)). The nature and scope of the illegal activity here can be reasonably described as extensive because Bindranauth and his co-conspirators laundered approximately one million dollars over a year and a half, using multiple different banks and layering techniques to mask their crimes. Accordingly, the district court did not clearly err in finding that Bindranauth was a leader in a criminal operation that was extensive. We thus affirm its application of the enhancement.

### 4. *The District Court's* Keene *Finding*

Finally, the government argues that we need not decide whether the guidelines were properly calculated because the district court stated that it would have imposed the same sentence despite the guidelines. The government thus contends that we may affirm the sentence under *Keene*, 470 F.3d 1347.

Here, the district court—before hearing arguments from the parties regarding their positions pursuant to § 3553(a) and before hearing from Bindranauth himself—announced that:

> In the event that this matter is taken up on appeal, and any one or more of this Court's objections is overruled – in fact, on appeal, that the appellate Court would have the benefit of this Court's ruling, that it would have imposed the same sentence, in any event, as . . . a reasonable sentence based on the 3553(a) factors.

In *Keene*, we determined that any error in calculating the guidelines is harmless where the district court makes clear that it would impose the same sentence regardless of the guidelines, provided the sentence is substantively reasonable under 18 U.S.C. § 3553(a). 470 F.3d at 1349. The district court in *Keene* noted that "even if the guideline calculations are wrong," its application of the sentencing factors under § 3553(a) would still have compelled the conclusion that a 10-year sentence was reasonable and appropriate under all the factors that it considered. *Id.* Notably, the court made this statement *after* it had reviewed and overruled Mr. Keene's objections to his PSI, found what it believed to be the appropriate guidelines range, considered the § 3553(a) factors, and pronounced its sentence. *Id.* at 1348–49. We determined that, because the district court had made clear that the sentence imposed would remain the same even "after the § 3553(a) factors are considered," any error was harmless. *Id.*

But we note that had there been a guidelines error here, the district court's statement would not have shielded its sentence from reversal. In determining a sentence, the guidelines range is the beginning of the analysis, not the end. Ensuring that a sentence adequately reflects all of the applicable § 3553(a) factors is a "holistic endeavor" that requires consideration of the specific individual before the court, and consequently involves hearing from the parties about the individual facts and circumstances of the case before imposition of a sentence. *See United States v. Rosales-Bruno*, 789 F.3d 1249, 1254 (11th Cir. 2015). Relatedly, we have made clear that "the right of allocution is 'the type of important safeguard that

helps assure the fairness, and hence legitimacy, of the sentencing process.'" *United States v. Prouty*, 303 F.3d 1249, 1253 (11th Cir. 2002) (quoting *United States v. Adams*, 252 F.3d 276, 288 (3d Cir. 2001)).

The problem with providing a purported *Keene* statement *before* listening to the parties' arguments is illustrated by what occurred at the sentencing hearing here. The district court ultimately changed its mind on one of the four proposed enhancements. The court initially stated that it appeared that each of the "adjustments are warranted, based on the evidence." Yet after hearing arguments on the vulnerable victim enhancement proposed in the PSI, the court reversed course, finding that the government did not meet its burden of establishing that Bindranauth knew the victims were vulnerable.

In *United States v. Delgado*, we advised that "the better practice would be for the court to make clear *at the time of pronouncing the sentence* that it would reach the same sentence regardless of the Guidelines range." 981 F.3d 889, 900 n. 8 (11th Cir. 2020) (emphasis added). We reiterate that instruction. "To arrive at an appropriate sentence, the district court must consider all of the applicable § 3553(a) factors." *Rosales-Bruno*, 789 F.3d at 1254. A sentencing court therefore cannot insulate itself from appellate review by declaring—before hearing any argument on those factors and before providing the accused the opportunity to allocute— that it would have imposed the same sentence anyway. If that were so, important procedural safeguards, federal sentencing hearings, the

requirements of § 3553(a), and the right to allocution, all might be rendered meaningless.

## IV.    CONCLUSION

For these reasons, we affirm Bindranauth's convictions and sentence.

**AFFIRMED.**